## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBORAH A. BARRY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 03:04-188 |
| | ) | |
| OHIO CASUALTY GROUP, t/d/b/a | ) | JUDGE KIM R. GIBSON |
| WEST AMERICAN INSURANCE | ) | |
| COMPANY, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

### SYNOPSIS

This matter comes before the Court on a Motion for Summary Judgment (Document No. 35)

filed by Defendant Ohio Casualty Group t/d/b/a West American Insurance Company (hereinafter "Ohio

Casualty" and "West American," respectively, or collectively referred to as the "Defendant") and a

Motion for Partial Summary Judgment (Document No. 37) filed by Deborah A. Barry[1] (hereinafter

"Barry"). Because the Court is convinced that genuine issues of material fact exist as to whether the

Defendant's handling of Barry's claim was done in bad faith, the Court will deny both of the motions

*sub judice*.

### BACKGROUND

As of March 28, 2001, Barry was insured through an auto insurance policy issued by the

---

[1] When Barry commenced this action, her name was Deborah A. Barry-Leonard. Document No. 1. On September 13, 2006, the Court granted her Motion to Amend Caption, thereby allowing her to be referred to as Deborah A. Barry. Document No. 59.

1

Defendant that provided, for each of the three vehicles covered under the policy, medical payment coverage in the amount of $100,000.00 and underinsured motorist (hereinafter "UIM") coverage in the amount of $25,000.00.[2] Document No. 39 at ¶ 1. The policy provided stacked UIM coverage. Since there were three vehicles, the total amount of the UIM coverage was $75,000.00. Document No. 45 at ¶ 4. On March 28, 2001, Barry was involved in a two-car accident in Altoona, Pennsylvania, in which the other driver was primarily at fault. Document No. 39 at ¶ 7. Barry subsequently suffered from injuries to her neck, left shoulder impingement syndrome, bone edema, left rotator cuff tendonitis with a possible labral injury, and an aggravation of migraine headaches. *Id.* at ¶ 7. The question of whether these injuries were caused by the accident is disputed by the Parties in this case. *Id.* at ¶ 7; Document No. 41 at ¶ 7. Barry sought medical treatment for her injuries, including several courses of physical therapy and various injection treatments. Document No. 39 at ¶ 8. She took medications and used a cervical collar. *Id.* She had surgery on her left shoulder on March 29, 2002, and then again on July 16, 2002. *Id.* The Defendant was informed of the accident on or around March 29, 2001, and proceeded to pay for the medical expenses incurred by Barry in the aftermath of the accident. *Id.* at 9. On August 15, 2002, the insurance carrier for the tortfeasor, Geico Direct, tendered its liability limits of $15,000.00 to settle Barry's liability claim. Document No. 45 at ¶ 7.

In a letter dated August 20, 2002, Barry placed the Defendant on notice that she was making a request for UIM coverage under the auto insurance policy. Document No. 39 at ¶ 10. At no time between March 28, 2001, and March 17, 2004, did the Defendant question the reasonableness or

---

[2] The Parties dispute the question of whether Ohio Casualty is properly named as a defendant in this action. Document No. 41 at ¶ 1.

necessity of the medical treatment paid for under the policy. *Id.* at ¶ 11. During this same period of time, the Defendant did not contend that Barry's injuries were not caused by the March 28, 2001, car accident. *Id.* at ¶ 12. At no time between March 28, 2001, and October 23, 2003, did the Defendant ask Barry to undergo a medical examination. *Id.* at ¶ 13. Stanley Chaya (hereinafter "Chaya") was the UIM claim representative who handled Barry's case. *Id.* at ¶ 19. In early September, 2002, Chaya reviewed the automated claim entry (hereinafter "ACE") notes and spoke with Ruth Ulmer, a claim representative for the Defendant, about Barry's left shoulder surgeries. Document No. 45 at ¶ 10. In a letter dated September 9, 2002, Chaya asked Barry's counsel to provide a settlement demand package. Document No. 39 at ¶ 28. There was no provision in the policy requiring Barry to provide a settlement demand package in order to make a UIM claim. *Id.* at ¶ 29.

Between August, 2002, and June, 2003, the Defendant used a computer software program known as "Colossus" to assist adjusters in evaluating certain types of claims. *Id.* at ¶ 36. During the period spanning September, 2002, through February, 2003, Chaya had no familiarity with Colossus. *Id.* at ¶ 37. In January, 2003, Chaya was instructed by the Defendant not to take any particular actions regarding the claims that he was handling. *Id.* at ¶ 39. Apparently, Chaya was preparing to retire, and he was instructed to forward all relevant mail and correspondence to the Defendant's home office in Raleigh, North Carolina. Document No. 41 at ¶ 39. After receiving a letter from Barry's counsel dated January 28, 2003, along with a packet of information, Chaya forwarded the correspondence to the Raleigh office. Document No. 39 at ¶ 40. The packet of information included a narrative of the summary of facts, as well as a summary of Barry's injuries, treatment, medical expenses, lost wages, loss of earning capacity and noneconomic damages. *Id.* at ¶ 41.

3

At no time between September 9, 2002, and February 24, 2003, was Barry asked to submit a statement under oath. *Id.* at ¶ 43. During that same period of time, nobody from the Defendant's Raleigh office instructed Chaya to seek authorizations for the purpose of obtaining copies of Barry's medical records. *Id.* at ¶ 46. The Defendant made no attempt to contact Barry's employer about her work history, either before or after the accident of March 28, 2001. *Id.* at ¶ 47. Donald Osborne (hereinafter "Osborne") was assigned by the Defendant as the claim representative for Barry's UIM claim on March 7, 2003. *Id.* at ¶ 48. Osborne never received training from the Defendant regarding the settling of reserves.[3] *Id.* at ¶ 51.

The Colossus value range for Barry's request for UIM coverage was $7,910.00-$12,350.00. *Id.* at ¶ 77. This range took into account an offset for the $15,000.00 paid by Geico Direct. Document No. 45 at ¶ 29. The figure of $7,910.00 was at the low end of the Colossus range, and the figure of $12,350.00 was at the high end of that range. Document No. 39 at ¶¶ 78-79. In May, 2003, John Halferty (hereinafter "Halferty") became Osborne's supervisor. *Id.* at ¶ 81. Osborne offered Barry $6,000.00, which he determined to be the value of her UIM claim. *Id.* at ¶ 83. This offer was verbally communicated to Barry's counsel on June 13, 2003. *Id.* at ¶ 87. The offer was rejected later that day in a letter to the Defendant. *Id.* at ¶ 88. An arbitrator was named on Barry's behalf, and a request was made that the Defendant name an arbitrator within thirty days. *Id.* On June 25, 2003, Osborne increased the offer to $16,000.00, and then later to $25,000.00.[4] Document No. 41 at ¶ 98. Prior to

---

[3] There is a dispute between the Parties as to whether Osborne increased the UIM reserve for Barry's claim from $15,000.00 to $35,000.00. Document No. 39 at ¶ 49; Document No. 41 at ¶ 49.

[4] Barry contends that there is no record of the $16,000.00 offer. Document No. 52 at ¶ 39.

4

June 26, 2003, Halferty had conducted no evaluation as to whether Osborne had honestly considered Barry's request for UIM coverage. Document No. 39 at ¶ 101. On that date, the Defendant retained Attorney Stephen Summers to handle the matter regarding Barry's request for UIM coverage. *Id.* at ¶ 107. On September 11, 2003, Attorney Summers appointed Mike Magee to serve as the arbitrator on behalf of the Defendant. Document No. 45 at ¶ 47. Attorney Joseph Hudock took Barry's statement under oath on September 24, 2003. *Id.* at ¶ 48. According to her statement, Barry has had migraines since she was a teenager. *Id.* at ¶ 49. She claimed that these migraines had worsened after the March 28, 2001, accident. *Id.* Barry also testified that she had been in an automobile accident in the early 1990's, and that she had suffered a neck injury at that time. *Id.* at ¶ 51.

On January 13, 2004, Dr. Joseph Basile performed a medical examination of Barry for $875.00. Document No. 39 at ¶ 125. Three days later, Dr. Basile's report of the examination was faxed to Attorney Summers. *Id.* at ¶ 126. On January 21, 2004, Osborne reported that Attorney Summers had found the results of the independent medical examination (hereinafter "IME") to be "so damaging" that the case was "worth over the policy limit." *Id.* at ¶ 130. Dr. Basile's report stated that Barry was disabled with respect to her employment as a hairdresser. Document No. 41 at ¶ 132.

Osborne gave Attorney Summers the authority to settle Barry's UIM claim for the full $75,000.00. Document No. 45 at ¶ 64. Attorney Summers made the offer to Barry on March 16, 2004, and Barry accepted. *Id.* at ¶ 65. On March 17, 2004, Attorney Summers sent a letter to Barry's counsel confirming the settlement and enclosing a release entitled "Release and Trust Agreement (Underinsured)." *Id.* at ¶ 68. After making changes to the release to include language reserving Barry's right to pursue a bad faith claim against the Defendant, Barry's counsel signed and returned the release

5

on March 26, 2004. *Id.* at ¶ 69.

## JURISDICTION

The instant action was commenced by Barry in the Pennsylvania Court of Common Pleas, Blair

County, on or around July 2, 2004. Document No. 1 at ¶ 1. The Defendant removed the case to this

Court pursuant to 28 U.S.C. § 1441. Barry is a citizen of Pennsylvania. *Id.* at ¶¶ 3-4. West American

is a corporation organized under the laws of the State of Indiana.[5] *Id.* at ¶ 6. It maintains its principal

place of business in Ohio. *Id.* The amount in controversy exceeds $75,000.00. *Id.* at ¶ 9. Therefore,

this Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1332(a)(1).

## SUMMARY JUDGMENT STANDARDS

> Summary judgment is appropriate only when it is demonstrated that there is no genuine
> issue as to any material fact and the moving party is entitled to judgment as a matter of
> law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S. Ct. 2548, 2552-57, 91 L.
> Ed. 2d 265, 273-80 (1986); Fed. R. Civ. P. 56(c). An issue of material fact is genuine
> 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving
> party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91
> L. Ed. 2d 202, 211-12 (1986). In deciding a motion for summary judgment, all
> reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. And
> Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638].

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-26 (3d Cir. 1994).

> As to materiality, the substantive law will identify which facts are material. Only
> disputes over facts that might affect the outcome of the suit under the governing law
> will properly preclude the entry of summary judgment. Factual disputes that are
> irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller,
> & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality
> inquiry is independent of and separate from the question of the incorporation of the

---

[5] West American and Ohio Casualty aver that Ohio Casualty is a service mark rather than an "insurer, corporation or other legal entity." Document No. 1 at ¶ 7. While the Parties dispute the status of Ohio Casualty, none of the Parties contend that Ohio Casualty is a "citizen" of Pennsylvania for purposes of 28 U.S.C. § 1332(a)(1). Therefore, the Parties' dispute regarding the status of Ohio Casualty does not raise jurisdictional concerns.

evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## DISCUSSION

Barry brings this action pursuant to 42 PA. C.S. § 8371, which provides as follows:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
(2) Award punitive damages against the insurer.
(3) Assess court costs and attorney fees against the insurer.

Barry asserts that Ohio Casualty acted in bad faith in failing to investigate her claim, engaging in low-

ball tactics, attempting to raise a frivolous defense, engaging in unreasonable delay, and allowing its

legal counsel to engage in improper conduct. Document No. 38, pp. 4-29. Before addressing those

issues, however, the Court must address a threshold issue raised by Ohio Casualty and West American.[6]

The Defendant contends that Ohio Casualty is "a non-entity incapable of being sued in the first instance.

. . ." Document No. 36, p. 33. In *Brown v. Progressive Insurance Company*, 860 A.2d 493 (Pa. Super.

Ct. 2004), the Pennsylvania Superior Court explained that "[t]here is no simple rule for determining

---

[6] The Court is not persuaded by Barry's argument that the Defendant has waived this issue by failing to raise it in a motion pursuant to Federal Rule of Civil Procedure 12(b)(6). The Defendant denied that Ohio Casualty is a corporation or insurance company in its answer. Document No. 5 at ¶ 2. Furthermore, as the Defendant points out, Rule 12(h)(2) clearly permits a party to raise a defense of failure to state a claim upon which relief can be granted at the trial on the merits. Document No. 50, p. 17.

who is the insurer for purposes of the bad faith statute." *Brown*, 860 A.2d at 498. "The question is necessarily one of fact, to be determined both by examining the policy documents themselves, and by considering the actions of the company involved." *Id.* The Superior Court identified two factors that must be considered for purposes of this inquiry: (1) the extent to which the entity was identified as the insurer on the policy documents, and (2) the extent to which the entity acted as an insurer. *Id.* It was noted that the "second factor is significantly more important than the first factor, because it focuses on the true actions of the parties rather than the vagaries of corporate structure and ownership." *Id.* at 498-99.

Defendant contends that "[t]he Policy declarations and identification cards specifically identify West American as the entity which issued the Policy." Document No. 36, p. 32. Defendant does not, however, provide a citation to support this assertion. The Court has examined the Policy language, and it remains unclear what the Defendant believes identifies West American as the entity that issued the Policy. The letterhead lists Ohio Casualty Group in all capital letters, with the following entities listed below: The Ohio Casualty Insurance Company, West American Insurance Company, American Fire and Casualty Company, and Ohio Security Insurance Company. Document No. 2, Ex. A. This letterhead listing appears to support the Defendant's assertion that Ohio Casualty Group is comprised of several different insurers, one of which is West American. Document No. 50, p. 17. In his deposition, Halferty testified that Ohio Casualty Group included West American, Ohio Casualty Insurance Company and American Fire and Casualty Company. Document No. 40, Halferty Dep., p. 12. He indicated that he was unsure about Ohio Security Insurance Company. *Id.* Chaya testified that the companies "involved within" Ohio Casualty Group were West American, Ohio Casualty Insurance Company, American Fire

8

and Casualty Company and Ohio Security Insurance Company. Document No. 40, Chaya Dep., p. 16. Although he identified Ohio Casualty Group as his employer, he indicated that he was the liability claims adjustor for all of the companies, excluding Ohio Security Insurance Company. *Id.* He stated that he was not "aware of" any other companies falling under the umbrella of Ohio Casualty Group. *Id.*

No clear answer as to the status of Ohio Casualty can be gleaned from the language of the Policy or the testimony of Halferty and Chaya. Osborne identified Ohio Casualty as his employer, but he did not elaborate any further. Document No. 40, Osborne Dep., p. 11. As the Superior Court noted in *Brown*, the most important factor to be considered is "the extent to which the company acted as an insurer." *Brown*, 860 A.2d at 498. At this point, neither Party has presented any evidence as to whether Ohio Casualty, as opposed to West American, "acted as an insurer." With respect to this issue, the Defendant is the moving party. Document No. 36, pp. 31-33. The Court does not construe Barry's argument as an affirmative attempt to obtain summary judgment on this issue, but rather as an attempt to defeat the Defendant's motion to have Ohio Casualty dismissed as a party. Barry discusses the issue only within the context of her opposition to the Defendant's motion. Document No. 43, pp. 20-21. Viewing what little evidence exists on this issue in the light most favorable to Barry, the non-moving party, the Court must deny the Defendant's motion to dismiss Ohio Casualty as a party.[7] It is unclear, at this stage, whether Ohio Casualty "acted as an insurer" for purposes of the standard discussed in

---

[7] The Court notes that Attorney Summers repeatedly referred to the insurer as "Ohio Casualty" in his September 25, 2003, letter to Osborne. Document No. 40, p. 24 ("In this matter, Ohio Casualty does have evidence that its insured's injuries may not be entirely related to the accident."). This tends to support Barry's argument that her insurer was Ohio Casualty. In any event, the Defendant's motion to dismiss cannot be granted at this stage, since it has not produced evidence to support its contention that Ohio Casualty is a non-entity.

9

*Brown.*  The Superior Court characterized the question of whether a company acts as an insurer as "necessarily one of fact," and this Court cannot make such a determination at the summary judgment stage on such an incomplete and cloudy record. *Brown*, 860 A.2d at 498. The Defendant remains free to argue at trial that Ohio Casualty is not an "insurer" within the meaning of 42 PA. C.S. § 8371.[8]

Before the Court addresses Barry's claim that the Defendant engaged in "bad faith" within the meaning of § 8371, two preliminary points should be noted. First, under Pennsylvania law, "bad faith must be proven by clear and convincing evidence and not merely insinuated." *Id.* Therefore, Barry must meet the "clear and convincing evidence" standard in order to prevail in her § 8371 case.[9] As the Supreme Court has made clear, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to that case." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986). Consequently, this Court will evaluate the Parties' motions for summary judgment with the "clear and convincing evidence" standard in mind.

Second, Barry's bad faith claim is not precluded as a matter of law merely because her UIM

---

[8] The issue in the present case is not one of statutory construction. Instead, the inquiry focuses on whether Ohio Casualty "acted as an insurer." *Brown*, 860 A.2d at 498. This inquiry conforms with the Superior Court's construction of the statute, which this Court follows in the instant case. As the Superior Court noted, however, the inquiry proceeds in the absence of legislative guidance as to the meaning of the word "insurer" as it appears in 42 PA. C.S. § 8371. *Id.* at 498-99 n. 7.

[9] The principle that Pennsylvania law requires bad faith on the part of an insurer to be proven by clear and convincing evidence is rooted in the decision of the Pennsylvania Supreme Court in *Cowden v. Aetna Casualty and Surety Co.*, 134 A.2d 223, 229 (Pa. 1957), which was decided long before the Pennsylvania Legislature enacted § 8371. The U.S. Court of Appeals for the Third Circuit, in *Polselli v. Nationwide Mutual Fire Insurance Company*, 23 F.3d 747 (3d Cir. 1994), noted that a legislature is "presumed to have been familiar with the law as it then existed and the judicial decisions construing it." *Polselli*, 23 F.3d at 751. Since the Pennsylvania Legislature was silent as to the applicable burden of proof in an action brought under § 8371, the statute has been construed to have incorporated the "clear and convincing evidence" standard that had been established in *Cowden*.

10

claim was ultimately honored by the Defendant. As the Defendant concedes, "bad faith may be established even when an insurer pays a claim. . . ." Document No. 36, p. 13. *See also Ania v. Allstate Ins. Co.*, 161 F. Supp.2d 424, 430 n.7 (E.D. Pa. 2001) (holding that § 8371"applies equally to an unreasonable delay in payment."); *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. Ct. 1999) ("[§ 8371] is not restricted to an insurer's bad faith in denying a claim. . . . An action for bad faith may also extend to the insurer's investigative practices."); *Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1142 (Pa. Super. Ct. 2006) ("Although the bad faith statute does not include a definition of 'bad faith,' the term encompasses a wide variety of objectionable conduct[.]"); *Brown*, 860 A.2d at 501 (finding that bad faith conduct includes the failure to investigate into the facts of a case, or the failure to communicate with the claimant); *Nat' l Grange Mut. Fire Ins. Co. v. Walsh*, No. 04-550, 2005 Pa. Dist. & Cnty. Dec. LEXIS 440, at *13 (Pa. D. & C. Dec. 29, 2005) ("Under Pennsylvania law, 'bad faith' is a frivolous or unfounded refusal to pay, lack of investigation into the facts, or a failure to communicate with the insured.").

The Pennsylvania Superior Court has established the elements Barry must satisfy in her § 8371 bad faith claim: (1) the insurer did not have a reasonable basis for denying benefits under the applicable insurance policy; and (2) the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim. *Terletsky v. Prudential Prop.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994). There is a requisite level of culpability associated with a finding of bad faith. It is clear that merely negligent conduct, however harmful to the interests of the insured, is categorically below the threshold required for a showing of bad faith. "[M]ere negligence or bad judgment is not bad faith." *Brown*, 860 A.2d at 501. In order to support a finding of bad faith, Barry must show that the Defendant "breached its duty

of good faith through some motive of self-interest or ill will." *Id.* "Bad faith claims are fact specific and depend on the conduct of the insurer *vis a vis* the insured." *Condio*, 899 A.2d at 1143.

Initially, the Parties dispute whether a § 8371 claimant must demonstrate that a defending insurer was motivated by self-interest or ill will. Ohio claims that "Plaintiff must show that the insurer breached its duty of good faith through some motive of self-interest or ill will." Document No. 56, p. 1 (citing *Condio*, 899 A.3d at 1143). In contrast, Barry argues that under Third Circuit precedent, she does not have to establish that the Defendant acted with a "motive of self-interest or ill-will" in order to prevail. Document No. 57, p. 3-4 (citing *Klinger v. State Farm Auto. Ins. Co.*, 115 F.3d 230 (3d Cir. 1997)). Document No. 57, p. 3.

The confusion traces back to *Terletsky*, wherein the Pennsylvania Superior Court relied in part on Black's definition of bad faith: "For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will." *Terletsky*, 649 A.2d at 688 (quoting BLACK'S LAW DICTIONARY 139 (6th ed. 1990)). Given the statutory silence as to what constitutes bad faith, many courts subsequently lifted this language from *Terletsky* without considering any possible tautology. *See, e.g.*, *Brown*, 860 A.2d at 501 ("In other words, the plaintiff must show that the insurer breached its duty of good faith through some motive of self-interest or ill will."); *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 380 (Pa. Super. Ct. 2002) ("It also must be shown that the insurer breached a known duty (*i.e.*, good faith and fair dealing), through some motive of self interest or ill will."); *O'Donnell*, 734 A.2d at 905 ("For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good

12

faith and fair dealing), through some motive of self-interest or ill will."); *see also Hollock v. Erie Ins. Exch.*, 903 A.2d 1185, 1187 n.1 (Pa. 2006) (Cappy, C.J., dissenting) ("Although this Court has not spoken to the definition of "bad faith" the Superior Court has consistently held that bad faith under the statute is established on a showing that the insurer breached its duty to act in good faith and fair dealing with its insured by any frivolous or unfounded refusal to pay the policy through some motive of self-interest or ill will.").

As the Third Circuit noted, however, the test for bad faith that *Terletsky* set forth did not require any motive of self-interest or ill will, but was instead stated more generally: Section 8371 plaintiffs must only show that the insurer had no reasonable basis for denying benefits under the policy and knew or recklessly disregarded its lack of reasonable basis in denying the claim. *Klinger*, 115 F.3d at 233-34. The Third Circuit noted that the use of Black's Law Dictionary was dictum and that self-interest is often the only plausible explanation for an insurer's delay. *Id.* Thus, the court held that a third element that "the insurer was motivated by an improper purpose such as ill will or self-interest" need not be satisfied in order for a plaintiff to establish a bad faith claim. *Id.*

Significantly, the Court can find no Pennsylvania decision that criticizes this aspect of *Klinger*. Pennsylvania courts have not restated the law of bad faith since *Terletsky* but have continued to use the language from that decision as a convenient guide across otherwise uncharted statutory terrain. The vitality of the "self-interest or ill will" language can be credited to the conceptual overlap between notions of self-interest, ill will, and knowing or reckless disregard; each has become a touchstone for the "dishonest purpose" that is also at the heart of the definition cited in *Terletsky*. *Terletsky*, 649 A.2d at 688 (quoting BLACK'S LAW DICTIONARY 139 (6th ed. 1990)). Furthermore, as *Klinger* points out,

13

a motive of self-interest or ill will can sometimes be the only explanation for an insurer's knowing or reckless disregard of its lack of a reasonable basis for denying a claim. While the search for self-interest or ill will thus helps preserve the heightened *scienter* level of § 8371, it does not comprise an independent element that Barry must prove.

In making her bad-faith claim, Barry contends that the Defendant's actions violated the Unfair Insurance Practices Act (hereinafter "UIPA"), 40 P.S. § 1171 *et seq.* Document No. 36, p. 3. In *Romano v. Nationwide Mutual Fire Insurance Company*, 646 A.2d 1228 (Pa. Super. Ct. 1994), the Superior Court noted that "the UIPA and the Department of Insurance Regulations can only be enforced by the State Insurance Commissioner and not by way of private action." *Romano*, 646 A.2d at 1232. Nevertheless, a court may look to the language of the UIPA as a guide for determining what type of conduct could constitute "bad faith" within the meaning of § 8371. *Id.* at 1233. Barry does not purport to pursue a claim under the UIPA. She may, however, pursue a private cause of action under § 8371 even though the allegations in her complaint fall within the purview of acts and practices prohibited by the UIPA. *Wright v. N. Am. Life Assurance Co.*, 539 A.2d 434, 438 (Pa. Super. Ct. 1988). Accordingly, this Court will discuss the provisions of the UIPA only insofar as they are relevant for purposes of the § 8371 analysis.

In support of her claim, Barry alleges a broad array of conduct that she believes constituted bad faith. First of all, she contends that the Defendant failed to conduct an adequate investigation of her UIM claim. Document No. 38, p. 4. She calls the Court's attention to § 1171.5(10)(vi) of the UIPA, which characterizes as unfair an insurer's practice of "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has

14

become reasonably clear." 40 P.S. § 1171.5(10)(vi). In support of her argument, Barry asserts that the Defendant recklessly assigned the handling of her case to Chaya, who had never handled a UIM claim before. Document No. 38, p. 5. The Defendant disputes Barry's contention that Chaya had no experience handling UIM claims. Document No. 42, p. 4.

Chaya's testimony clearly supports Barry's contention that Chaya did not conduct a thorough investigation into the circumstances surrounding her claim. Document No. 40, Chaya Dep., pp. 92-100. He did not review the first-party file, ask Barry to submit to an examination under oath, seek Barry's medical records, ask Barry to undergo a medical examination, or seek access to her employment history. *Id.* Instead, he testified that he acted only as "an overseer of the file until it was in a position to resolve." *Id.* at 99.

Barry alleges that the Defendant engaged in low-ball tactics throughout the claims-handling process. Document No. 51, pp. 5-8. The UIPA prohibits an insurer from "[a]ttempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application." 40 P.S. § 1171.5(a)(10)(viii). Generally speaking, Pennsylvania law does not treat as bad faith an insurer's low but reasonable estimate of an insured's losses. *Brown*, 860 A.2d at 501. Nevertheless, low-ball offers which bear no reasonable relationship to an insured's actual losses can constitute bad faith within the meaning of § 8371. *Id.* The dispositive question is whether a reasonable jury could conclude, on the basis of clear and convincing evidence, that the Defendant acted in bad faith by offering to settle Barry's case for significantly less than the amount of her actual losses.

In the case *sub judice*, Barry has presented evidence that the increase in the offer, which went

15

from $6,000.00 to $25,000.00 in a two-week period, occurred in the absence of any additional evidence. Document No. 40, Halferty Dep., pp. 123-24. Both Halferty and Osborne testified that this increase was not due to any particular discovery of new information. *Id.*; Document No. 40, Osborne Dep., p. 158. Halferty testified that the figures were based on an estimation, and that there was no documentation available. Document No. 40, Halferty Dep., p. 136. He also testified that the Defendant made an initial offer of $6,000.00, which was below the lowest figure in the Colossus value range. *Id.*, p. 112. He further explained that the Defendant typically made offers at the lower end of the range for purposes of beginning settlement negotiations. *Id.*, pp. 115-17. Based upon this evidence, the Court is convinced that a reasonable jury could conclude, on the basis of clear and convincing evidence, that the Defendant acted in bad faith with respect to its offering Barry unreasonably low offers during the negotiations to settle her UIM claim.

Barry contends that the Defendant attempted to raise a frivolous causation defense for the purpose of denying her UIM claim. Document No. 38, pp. 18-23. The applicable portions of the Policy state as follows:

## PART B-MEDICAL PAYMENTS COVERAGE
## INSURING AGREEMENT
A. We will pay reasonable expenses incurred for necessary medical and funeral services because of "bodily injury:"
   1. Caused by accident; and
   2. Sustained by an "insured" for services rendered.

\*\*\*

## FIRST PARTY BENEFITS COVERAGE INSURING AGREEMENT
### A. BASIC FIRST PARTY BENEFIT
We will pay, in accordance with the Act, the Basic First Party Benefit to or for an "insured" who sustains "bodily injury." The "bodily injury" must be caused

16

by an accident arising out of the maintenance or use of a "motor vehicle."
Subject to the limit shown in the Schedule or Declarations, the Basic First Party
Benefit consists of:
Medical expenses. Reasonable and necessary medical expenses incurred for an
"insured's":

1.     Care;
2.     Recovery; or
3.     Rehabilitation.

**\*\*\***

**B.**     **ADDED FIRST PARTY BENEFITS**
If the Schedule or Declarations indicates that Added First Party Benefits apply,
we will pay Added First Party Benefits instead of the Basic First Party Benefit
to or for an "insured" who sustains "bodily injury". The "bodily injury" must
be caused by an accident arising out of the maintenance or use of a "motor
vehicle". These benefits are subject to the provisions of the Act.
Subject to the limits shown in the Schedule or Declarations, Added First Party
Benefits consist of the following:

1.     Medical expenses as described in the Basic First Party Benefit.

**\*\*\***

**UNDERINSURED MOTORISTS COVERAGE (STACKED)**

**\*\*\***

**INSURING AGREEMENT**

**A.**     We will pay compensatory damages which an "insured" is legally entitled to
recover from the owner or operator of an "underinsured motor vehicle" because
of "bodily injury":

1.     Sustained by an "insured"; and
2.     Caused by an accident.

Document No. 40, Exhibit A, pp. 5, 23, 29.

Barry bases her argument on the fact that the Defendant raised a causation defense with respect

to her UIM claim after failing to question causation with respect to her claims under the medical

expense provisions of the Policy. Document No. 38, p. 18. She points out that the language in both

17

portions of the policy uses similar language regarding causation, indicating that the Defendant, under

either provision, would pay damages to its insured for injuries *caused by an accident. Id.* at 37-38. The

Defendant responds by contending that it never denied Barry's UIM claim on the basis of causation, but

rather found a need for further proof of causation before opting to honor the claim. Document No. 42,

p. 14. In support of her position, Barry calls the Court's attention to a letter from Attorney Summers

to Osborne dated September 25, 2003, in which Attorney Summers stated as follows:

> The *Hollock* case, although only persuasive, cites the "ideal" standard that should be
> binding regarding bad faith claims and insureds. According to this standard, Ohio
> Casualty must have a reasonable basis for denying UIM benefits and cannot take
> inconsistent positions when handling the UIM claim. As of April 4, 2001, Ohio
> Casualty may have been aware that its insured had a pre-existing condition, not related
> to the accident, that may be contributing to her symptoms. At no time did Ohio
> Casualty contest the medical treatment or inquire further into care. A court could view
> this as being unreasonable, particularly since notice of the pre-existing condition was
> in 2001, and the company did not begin to even question the causal relationship between
> the accident and the injuries until September of 2002.
>
> However, *Hollock* is distinguishable from the case at hand in one context. In
> *Hollock*, the facts reveal that there was [*sic*] extreme and egregious examples of Erie's
> misconduct. In addition, there were no facts available to establish that there was not a
> causal relationship between the accident and subsequent injuries in *Hollock*. In this
> matter, Ohio Casualty does have evidence that its insured's injuries may not be entirely
> related to the accident.
>
> A strict reading of *Hollock* would indicate that Ohio Casualty would be estopped
> from claiming that the actual injury claimed to have resulted in the surgeries is not
> related to the motor vehicle accident. However, the theory that the UIM handler is
> bound by the actions of the first party handler is contained only in the *Hollock* opinion,
> which cited no precedent or any prior cases in support of this contention. In addition,
> it should be kept in mind that because *Hollock* is a trial court opinion from another
> jurisdiction, it is not binding on the arbitrators in this instance.

Document No. 40, Exhibit G. The *Hollock* case referred to in the letter was a decision of the

Pennsylvania Court of Common Pleas of Luzerne County. *Hollock v. Erie Ins. Exch.*, 54 Pa. D & C 4th

449 (2002). This decision was affirmed by the Pennsylvania Superior Court. *Hollock v. Erie Ins. Exch.*,

842 A.2d 409 (Pa. Super. Ct. 2004).

Barry asserts that the Defendant was on notice that its reliance on a causation defense could constitute bad faith. Nevertheless, Attorney Summers also indicated that the Defendant had evidence that called the causation of Barry's injuries into question, thereby distinguishing *Hollock*. The Defendant's computer notes indicate that Osborne questioned whether Barry's injuries were actually caused by the accident of March 28, 2001. Document No. 35, Exhibit C, p. 12. He indicated that her injuries may have been caused by either a fall subsequent to the accident or an incident on February 11, 2003, in which she was allegedly hit by a car, causing her to be thrown 8-10 feet. *Id.*

In *Pantelis v. Erie Insurance Exchange*, 890 A.2d 1063 (Pa. Super. Ct. 2006), the Pennsylvania Superior Court explained that the "payment of first party benefits does not preclude an insurer from later denying third party UM/UIM benefits." *Pantelis*, 890 A.2d at 1067-68. "[A] payment of first party benefits does not, in and of itself, constitute an admission of causation and a concomitant obligation to pay UM/UIM benefits." *Id.* at 1068 n.4. For this reason, the Defendant's prior acceptance of its obligation to provide coverage to Barry under the first-party portions of the policy did not operate as a bar preventing the Defendant from later raising the issue of causation with respect to the UIM benefits. Consequently, in order to maintain a bad faith claim, Barry must show more than a mere inconsistency between the Defendant's handling of the first-party and the third-party UM/UIM benefits.

The Court has before it a medical report completed by Dr. Robert Shaheen dated July 10, 2001. Document No. 40, Exhibit C, pp. 470-71. Barry contends that Dr. Shaheen's report indicated that the acciddent caused her shoulder injuries. Document No. 38, p. 13. The treatment notes indicate that Barry suffered from a shoulder strain and that these impairments were caused by the accident on March

28, 2001.  Document No. 40, Exhibit C, pp. 470-71.  Dr. Shaheen's report lends support to Barry's
contention that the Defendant was aware of the actual cause of her injuries and that its attempt to raise
an issue regarding causation was frivolous.  Based upon the record, the Court concludes that a
reasonable jury may conclude, on the basis of clear and convincing evidence, that the Defendant's
decision to question the cause of Barry's injuries was made in bad faith.  No opinion is expressed as to
whether the Defendant's conduct constituted bad faith under § 8371.  That determination will be for the
finder of fact.

Barry argues that the Defendant acted in bad faith by engaging in delay tactics throughout its
handling of her UIM claim.  Document No. 38, pp. 23-27.  The prohibition contained in § 8371 is not
limited to an actual denial of benefits, and "applies equally to an unreasonable delay in payment." *Ania
v. Allstate Ins. Co.*, 161 F. Supp. 2d 424, 430 (E.D. Pa. 2001).  The UIPA identifies as an unfair
insurance practice the act of "[f]ailing to adopt and implement reasonable standards for the prompt
investigation of claims arising under insurance policies."  40 P.S. § 1171.5(a)(10)(iii).

Barry contends that the Defendant delayed in scheduling her independent medical examination.[10]
Document No. 38, p. 25.  In November, 2003, Attorney Summers scheduled Barry's examination with
Dr. Gerard Moncman.  Document No. 40, WA 30597.  Apparently, the appointment was cancelled due

---

[10] Barry relies on the decision of the U.S. Court of Appeals for the Third Circuit in *Willow Inn, Inc. v. Public
Service Mutual Ins. Co.*, 399 F.3d 224 (3d Cir. 2005), in support of her contention that the scheduling of her medical
examination, which she alleges was for the purpose of concocting a basis for denying her UIM claim, constituted bad faith
under § 8371.  Document No. 51, pp. 12-13.  In *Willow Inn*, the Court of Appeals determined that an insurer's pattern of
delay suggested that its actions were specifically designed to achieve a fiscally beneficial result for itself.  *Willow Inn*, 399
F.3d at 233.  This analysis was conducted for the purpose of determining whether the degree of reprehensibility of the
insurer's conduct was constitutionally sufficient to justify the particular award of punitive damages in that case under *State
Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003).  That
inquiry, of course, is distinct from this Court's bad faith inquiry under § 8371.  Nevertheless, conduct that is deemed
"reprehensible" under *Campbell* is also likely to constitute "bad faith" within the meaning of § 8371.

to a conflict of interest. Document No. 35, Exhibit C, WA 0007. Attorney Summers subsequently made an appointment for Barry to be examined by Dr. Charles Harvey. Document No. 40, WA 30577. Nevertheless, Dr. Harvey had a conflict of interest, since he had referred Barry to Dr. Robert Singer for shoulder surgery. *Id.* Ultimately, the examination was performed by Dr. Joseph Basile on January 13, 2004. One week later, Attorney Summers informed Osborne that the results of the examination were "so damaging" that the case was likely "worth over the policy limit." Document No. 35, Exhibit C, WA 0005.

Barry contends that the Defendant's legal counsel engaged in improper conduct, and that this conduct should be considered as a part of the broader bad faith inquiry. Document No. 38, pp. 27-29. In *Klinger*, the Court of Appeals noted that "representation is not an excuse for the insurer's failure to perform its obligations under the policy it issued to the insured." *Klinger*, 115 F.3d at 234 n.2. The Court of Appeals reasoned that

> because counsel for the insureds cannot simply make an 'end-run' around the insurer's attorney to deal directly with the insurer, the insurer may not hide behind this relationship to argue that it reasonably ignored its obligations under the insurance policy to its insureds, one of which is to pay them compensation if injured. Otherwise, an insurer could simply hire counsel, bury its head in the sand, pay when ordered to do so, retain the use of the insured's money in the meantime, and escape without adverse consequences.

*Id.*

In support of her bad faith claim, Barry maintains that Attorney Summers wrongfully sought to obtain her medical records for a period of ten years prior to the 2001 car accident. Document No. 38, p. 27. Under certain circumstances, an insured can prove bad faith by showing that the insurer demanded an unnecessary amount of personal information before honoring a valid claim. *Lockhart v.*

21

*Fed. Ins. Co.*, No. 96-5330, 1998 U.S. Dist. LEXIS 4046, \*\*11-12 (E.D. Pa. March 31, 1998). The Defendant does not dispute that Attorney Summers made such a request. Nevertheless, the Defendant argues that this request was reasonable in light of Barry's "complex medical history prior to the accident, as well as her involvement in previous accidents." Document No. 42, p. 20. The Defendant's purpose for requesting these records is clearly in dispute.

In all, Barry contends that the Defendant's dilatory tactics and gross incompetence delayed the payment of her UIM claim by at least 17 months. Document No. 38, p. 26. Having reviewed in detail the allegations made by Barry and the evidence in support thereof, the Court is convinced that sufficient evidence has been presented to enable a reasonable jury to find the existence of bad faith by clear and convincing evidence. Nevertheless, the Defendant has presented sufficient evidence to preclude the granting of summary judgment in favor of Barry.[11] A genuine issue of material fact exists as to whether the Defendant's handling of Barry's UIM claim was conducted in bad faith. Accordingly, the Court must deny the motions for summary judgment filed by both Parties.[12]

Barry alleges an entire course of conduct allegedly constituting bad faith. Since she has filed her claim pursuant to § 8371, her action sounds in tort rather than in contract. Pennsylvania recognizes "a common law action for bad faith sounding in contract." *Johnson v. Beane*, 664 A.2d 96, 101 (Pa. 1995) (Cappy, J., concurring). Pennsylvania does not recognize a common law tort action for bad faith. *D'Ambrosio v. Pa. Nat'l Mut. Cas. Ins. Co.*, 431 A.2d 966 (Pa. 1981). Therefore, the only tort remedy

---

[11] The Court notes that the Defendant settled Barry's UIM claim for the policy limit after receiving Dr. Basile's examination report.

[12] The Court will not deny the Defendant's motion solely because of the oversight resulting in its failure to file a Concise Statement of Material Facts in a timely manner. Document No. 50, pp. 1-2.

for bad faith available under Pennsylvania law is that provided by § 8371. *The Birth Ctr. v. The St. Paul Cos. Inc.*, 787 A.2d 376, 390-91 (Pa. 2001) (Nigro, J., concurring).

Since the statutory bad faith claim asserted by Barry is based on an entire course of alleged dilatory conduct, rather than on a particular incident or denial of a claim, the finder of fact will have to consider the entire course of conduct in order to determine whether the Defendant's handling of Barry's UIM claim was conducted in bad faith. Since most of the Pennsylvania cases applying § 8371 address situations where a claim was actually denied, it is not entirely clear to the Court whether the Pennsylvania courts would parse through this detailed fact pattern, distinguishing between those actions that could demonstrate bad faith and those that could not. Nonetheless, the jurisdictions recognizing the tort of bad faith have been virtually uniform in allowing the finder of fact to consider the insurer's entire course of conduct in determining whether a showing of bad faith has been made. *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004) ("In Florida, the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard."); *Dale v. Guar. Nat'l Ins. Co.*, 948 P.2d 545, 551 (Co. 1997) ("[T]he tort of bad faith breach of an insurance contract encompasses an entire course of conduct and is cumulative."); *Alsobrook v. Nat'l Travelers Life Ins. Co.*, 852 P.2d 768, 770 (Okla. Ct. App. 1992) ("[T]he entire course of conduct between the parties may be considered by the jury."); *Safeco Ins. Co. v. Ellinghouse*, 725 P.2d 217, 225 (Mont. 1986) ("The essence of the cause before the Court is failure to deal fairly and in good faith with an insured and as such, the jury may be shown the entire course of conduct between the parties to arrive at a determination of whether that standard had been breached or not."). Accordingly, the Court concludes that the Supreme Court of Pennsylvania, if presented with the present

23

case, would most likely hold that the entire course of conduct by the Defendant throughout its handling of Barry's UIM claim can be considered by the jury in determining whether the Defendant acted in bad faith for purposes of § 8371.

## CONCLUSION

At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Even considering the "clear and convincing evidence" standard of review, the Court is convinced that this case cannot be resolved at the summary judgment stage. Unlike most cases arising under § 8371, this case does not involve a denial of coverage. Instead, it involves an allegation of bad faith throughout the claims handling process, which necessarily entails an examination of the entire series of events. It will be for the finder of fact to determine whether Barry can show, by clear and convincing evidence, that the Defendant's handling of her UIM claim was conducted in bad faith. Accordingly, the Court must deny the Defendant's Motion for Summary Judgment (Document No. 35) and Barry's Motion for Summary Judgment (Document No. 37). An appropriate order follows.

24

**AND NOW**, this 12th day of January, 2007, this matter coming before the Court on the Defendant's Motion for Summary Judgment (Document No. 35) and the Plaintiff's Motion for Summary Judgment (Document No. 37), **IT IS HEREBY ORDERED** that the Defendant's Motion for Summary Judgment is **DENIED** and the Plaintiff's Motion for Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED** that a telephonic post-discovery status conference is hereby set for **Tuesday January 30, 2007, at 11:00 a.m**. Counsel are responsible for coordinating the conference call to chambers.

**IT IS FURTHER ORDERED** that prior to the January 30, 2007, status conference, all counsel shall confer and submit for the Court's review a Proposed Final Scheduling Order in conformance with Local Rule 16.1.2.B. 2-6.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

**Cc: All counsel of record**

25